**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>    **v.**<br><br>**DESMOND JANQDHARI** | **CRIMINAL ACTION**<br><br>**NO. 14-217-1** |

**Baylson, J.**                                                          **November 5, 2015**

**MEMORANDUM OF LAW RE MOTIONS TO SUPPRESS**

**I.      Introduction**

The facts of this case are briefly as follows:

In the early evening hours of January 6, 2014, Ms. Mary Cara Heron was in the rear

driveway of her residence in the City of Philadelphia. She was unloading packages from her car

when two individuals approached her. According to her testimony, this defendant, Desmond

Janqdhari, placed a handgun at her side, causing her to scream and drop her pocketbook.

Ms. Heron regained possession of her keys and handed them to defendant, who tossed them to a

second male standing by the other car door. The two males then took the victim's pocketbook and

drove off with the car.

Ms. Heron described the individual with the gun as a black male in his late twenties who

had a small beard, weighed approximately 180 pounds, stood approximately 5'11" tall, and had

light skin. The victim was unable to give any facts to identify the second male.

Within a week of the incident, defendant Desmond Janqdhari was admitted to the hospital

because of gunshot wounds. While the defendant was hospitalized and on pain medications,

Philadelphia Police Detective James Poulos and Sergeant Michael Corbett interviewed him.

During this interview, defendant provided verbal and written confessions to the crimes against

Ms. Heron.

Two weeks after the incident, Philadelphia Police Detectives James Poulos and Michael Schlosser met with Ms. Heron inside her home and showed her a photographic array with photos of eight individuals, including that of the defendant Desmond Janqdhari. Ms. Heron, also African-American, promptly picked out Defendant Janqdhari's photograph, identifying him as the male who had placed the gun at her side during the robbery. She was unable to make an identification of the second individual, a co-defendant, Keith Williams.

Defendant has filed a motion to suppress his identification (ECF 43) and a motion to suppress his confession (ECF 72). For the reasons that follow, the Court will deny both motions.

## II.    Findings of Fact After Evidentiary Hearing - Identification

Related to defendant's motion to suppress his identification (ECF 43), the Court held an evidentiary hearing on April 24, 2015.

In this hearing, Ms. Heron testified to the facts of the offense. She further testified that she recognized the photograph of the defendant as the individual charged with carjacking in this case and testified to the circumstances under which she identified the photographs. According to her testimony, the police officers who showed her photographs did not make any suggestions or other prompts that resulted in her identifying a photograph of the defendant as the photograph of the person who attacked her. The Court finds that her testimony was credible in all respects.

Detective Schlosser testified to the selection of photographs for the array and the manner of presentation to Ms. Heron. The Court finds his testimony credible in all respects and that he did not use any suggestive methods or verbal or nonverbal communications with Ms. Heron in presenting the photographs.

Detective James Poulos, a detective for the Philadelphia Police Department, testified that he was present when the photographic array was prepared and shown to the victim. He testified that no suggestions or other verbal or nonverbal prompts were made to the victim at the time she reviewed the array and identified the photograph of the defendant. The Court finds Detective Poulos's testimony credible in all respects.

Defendant argues that the procedures used by the police were unduly suggestive. The defendant asserts that there were substantial contradictions between the victim's initial description of the robber and the description she gave the police a few hours later at the police station. The Court rejects this argument because the facts presented by the victim in each circumstance, although slightly varied, were not at all dramatically different. Furthermore, a review of the photographs that were in the array reveals that the depicted individuals bore substantial similarities to each other. All were African-American, several had some facial hair similar to that of the defendant, and although their complexions varied somewhat, at least four of them had very similar complexions.

To support his theory of undue suggestiveness, defendant presented Dr. Steven Penrod, an expert on photographic identification procedures. Dr. Penrod has studied the important issue of identification by crime victims for a number of years and published a number of papers. At a separate hearing on July 17, 2015, Dr. Penrod testified to the problems inherent in the identification of defendants when a victim has suffered a violent crime. He opined that because the victim in this case was under stress and had only a brief period of time to observe the perpetrator, she would be very susceptible to suggestive identification procedures. The Court accepts Dr. Penrod's general testimony on these factors. However, although his opinions on identification

procedures are based on solid experience and the observations of many cases, they are not applicable in this case. This is because Dr. Penrod never gave any opinions about whether the procedures used in this case were improper or unduly suggestive, or whether the detectives' treatment of Ms. Heron created any inherently unreliable results.

A defendant bears the burden of proof in challenging the admissibility of identification testimony. *United States v. Lawrence*, 349 F.3d 109, 115 (3d Cir. 2003). Eyewitness testimony will be permitted unless the pretrial identification procedure was so unnecessarily suggestive as to give rise to such a substantial likelihood of misidentification that admitting the identification testimony would be a denial of due process. *United States v. Clausen*, 328 F.3d 708, 713 (3d Cir. 2003) (citing *United States v. Mathis*, 264 F.3d 321, 330 (3d Cir. 2001)); *United States v. Emanuele*, 51 F.3d 1123, 1128 (3d Cir. 1995). In weighing the suggestiveness of a photo array, a court looks at the totality of the circumstances. *Neil v. Biggers*, 409 U.S. 188, 199 (1972).

In *United States v. Brownlee*, 454 F.3d 131, 137 (3d Cir. 2006), the Third Circuit explained that an identification procedure violates due process *only* if "it is both (1) unnecessarily suggestive and (2) creates a substantial risk of misidentification."

In this case, review of the photographic array coupled with the very credible testimony of Ms. Heron and the police detectives warrants a conclusion that defendant has failed to satisfy his burden of proving that the Ms. Heron's identification is inherently unreliable. *See United States v. Burnett*, 773 F.3d 122, 133-34 (3d Cir. 2014) (affirming district court's finding that array was not unduly suggestive under very similar circumstances to those here). In *Burnett*, the court stated:

> Burnett [the defendant] argues that the photo array that led to his identification was unduly suggestive because the photos of the other individuals in the array did not sufficiently resemble him. The District Court examined the array and disagreed, noting that each of the photographs was of an African–American male 'with facial

4

hair, a goatee, some of them with pepper coloring in their goatee, and all of the males ... relatively light skinned.' Burnett himself is 'an African–American of light skin and light color eyes, sporting a goatee with some gray hair, and he has a relatively sparse head of hair.' The Court found that all of the men in the array were of a similar age; there was no striking difference in the amount of head hair each had; and the skin color of the members of the array was not strikingly different. The Court concluded that any slight differences in the appearances of those depicted did not rise to the level of being unduly suggestive, and did not create a risk of misidentification.

*Id.* (citations omitted).

For the above reasons, the Court will deny defendant's motion to suppress the identification.

### III. Findings of Fact After Evidentiary Hearings – Confession

Defendant also filed a motion to suppress his confession, which he made to police on January 12, 2014 while he was a patient at Einstein Medical Center (ECF 72). On January 11, 2014, Defendant was admitted to the Einstein Medical Center because of multiple gunshot wounds and was accompanied by police at the time of his admission. Beginning the morning of January 12, 2014, pain medications, including morphine, were administered to defendant. Defendant received surgery for his injuries on January 13, 2014 and was discharged January 15, 2014.

Detective Poulos and Sergeant Corbett interviewed the defendant in his hospital room from approximately 9:00 pm until 10:35 pm on January 12, 2014, the day after the defendant was admitted and while the defendant was receiving pain medications. According to Detective Poulos's testimony, after he gave the defendant his *Miranda* warnings, the defendant made a verbal and written confession to committing the crime. Detective Poulos testified that the defendant did not appear "intoxicated in any way" during the interview. (ECF 114 at 107).

Defendant moved to suppress his confession on the ground that it was involuntarily made

5

as a result of the medications he was taking at the time of the interview. Related to this motion, the Court held an evidentiary hearing on September 16, 2015 to hear the testimony of defense expert Dr. David Benjamin, who is a highly qualified clinical pharmacologist and toxicologist and has written many papers on the effects of opioids on people. Dr. Benjamin did not personally treat the defendant but had reviewed the medical records from defendant's January 2012 hospital stay. The government did not dispute Dr. Benjamin's qualifications.

In a report dated June 23, 2015, exhibit D-7, Dr. Benjamin relayed the factual history related to defendant's treatment at Einstein Medical Center. At the hearing on September 16, 2015, Dr. Benjamin testified extensively about the pain control medications that were administered to defendant beginning on January 12, 2014 at 7:27 a.m., and the doses of morphine that the defendant received for pain control during that day. Dr. Benjamin specifically concentrated on the amount of morphine self-administered by defendant through the use of a patient controlled anesthesia ("PCA"), providing substantial testimony on this topic.

After detailing the levels of morphine received by defendant, Dr. Benjamin testified to his opinion that defendant was not capable of making any kind of informed consent or waiver of his constitutional rights. He concluded, with reasonable scientific certainty, that at the time defendant was interviewed on January 12, 2014, he was under the influence of narcotics, had diminished cognitive functions, and was experiencing moderate pain. Dr. Benjamin further concluded that because of defendant's condition, defendant was not capable of making reliable cognitive decisions on his own, and without the presence of an attorney or other neutral person or victims' advocate, his statement was not voluntary.

Dr. Benjamin was cross-examined extensively at the hearing about notations in the medical

6

records that implied that defendant was alert and aware of his surrounding circumstances.

In response to questions by the Court, Dr. Benjamin agreed that there was nothing in the hospital notes themselves that made any comment that the defendant was unable to communicate or make any decisions, and Dr. Benjamin agreed that if this was defendant's condition, the hospital notes would likely have included such a comment.

In response to the testimony of Dr. Benjamin, the government called two nurses who had treated defendant on January 12, 2014, Ms. Diane Anthony and Ms. Aidan Sliwinski. Although the nurses did not specifically remember their interactions with defendant, the nurses went through the same hospital records that Dr. Benjamin had relied on and testified to notations that they had personally made at the time, indicating that defendant was alert and communicative, defendant had shown "complete independence," his condition was appropriate, his speech was clear, and there was no indication of any cognitive impairment. Further credible testimony by the two nurses presented factual statements that significantly contradicted and undermined the opinions stated by Dr. Benjamin on the previous day.

The Court finds that the two nurses were very credible and that their actual factual testimony and the records they made on the day in question are deserving of more weight than the testimony of Dr. Benjamin, which was based merely on the hospital records.

Defendant cites very few cases for legal support for his motion to suppress identification, principally a decision by Judge Robreno of this Court, *United States v. Burnett*, No. 11-274-01, 2013 WL 3380532, at *5-7 (E.D. Pa. July 8, 2013). But in *Burnett*, the defense expert's opinion was not rebutted by any medical witness. In this case, the government provided credible rebuttal evidence from the nurses who treated defendant, distinguishing this case from *Burnett*. In addition,

Detective Poulos's testimony rebutted the expert witness. The Court finds that these factual witnesses are deserving of more weight than the testimony of the expert who was relying solely on medical records that he took no part in creating.

There do not appear to be any Third Circuit cases focusing on suppression of testimony because of an intake of morphine or similar drugs, but there are a number of cases cited by the government in other Circuits that have rejected suppression motions based on intake of addictive or similar drugs. *E.g.*, *United States v. Magness*, 69 F.3d 872, 874 (8th Cir. 1995); *United States v. Baltrunas*, 957 F.2d 491, 496 (7th Cir. 1992); *United States v. Short*, 947 F.2d 1445, 1449 (10th Cir. 1991); *United States v. Haddon*, 927 F.2d 942, 946 (7th Cir. 1991); *Boggs v. Blair*, 892 F.2d 1193, 1198-99 (4th Cir. 1989).

Additionally, the Court finds persuasive the Second Circuit's reasoning in a habeas case involving similar facts. *See Pagan v. Kane*, 984 F.2d 61, 63 (2d Cir. 1993) (concluding that findings that defendant's confession was voluntary was not in error where defendant had been given morphine within three hours of his confession and defendant still needed an oxygen mask when interviewed).

In that case, the Court stated:

On appeal, petitioner attacks the finding of the state courts and District Court that his confession was not coerced. He asserts that his condition was extremely critical, that he had been given morphine less than three hours before his interrogation, that he had a high fever, that he was required to wear an oxygen mask (which he apparently took off to answer questions), and that at least five tubes or catheters were connected to his body. In light of these facts, he argues that he was subject to overbearing police tactics that overwhelmed his diminished free will. Under somewhat similar circumstances, the Supreme Court has found confessions to be involuntary. *See Mincey v. Arizona,* 437 U.S. 385, 396-402 (1978).

From the record before us, however, we cannot conclude that the finding of voluntariness was in error. Weir testified before the state trial court that though 'weakened,' the defendant was 'very alert [and] able to answer all our questions

with no problem.'Further, the content of petitioner's statements, which attempted to shift blame for the shooting to an accomplice, suggests that petitioner was well aware of the nature of the police questioning. Petitioner's medical records, which describe petitioner as 'awake, alert, and oriented,' were also introduced before the trial court. Although petitioner now objects to the significance and interpretation given some of this evidence by the trial court, he has not suggested that the state suppression hearing was so inadequate as to remove the presumption of correctness given state court factual findings. *See* 28 U.S.C. § 2254(d) (1988).

*Pagan*, 984 F.2d at 63.

The Court finds that the defendant understood the warnings, defendant knowingly and intelligently waived the right to have counsel present, and that the statement was voluntary in all respects. Therefore, the government has met its burden of establishing that defendant's will was not overborne. *See United States v. Swint*, 15 F.3d 286, 289 (3d Cir. 1994) (stating the government's burden of proving by a preponderance of the evidence that defendant's confession was voluntarily given).

## IV.    Conclusion

For the above reasons, defendant's motions to suppress identification and his confession will be denied.

An appropriate Order follows.

O:\Criminal Cases\14-217 janqdhari\14cr217.ff.9.18.15.docx